Florence R. Delling, Appellee, v. Lake View Hospital Association and Training School for Nurses and John J. Flavin, Administrator De Bonis Non of Estate of Ezra C. Porter, Deceased, Defendants. Appeal of Lake View Hospital Association and Training School for Nurses, Appellant.

Gen. No. 41,533.

Opinion filed April 23, 1941.

EDWARD W. RAWLINS and JAMES F. WRIGHT, both of Chicago, for appellant; FAY WARREN JOHNSON, of Chicago, of counsel. ROBERT M. WOODWARD and ROBERT J. SPAHR, both of Chicago, for appellee.

MR. JUSTICE BURKE delivered the opinion of the court.

On October 28, 1935, plaintiff filed her complaint in the superior court of Cook county against the Lake View Hospital Association and Training School for Nurses, a corporation, and Ezra C. Porter, a physician. After the cause was placed at issue, Dr. Porter died. His death was suggested and John J. Flavin, administrator *de bonis non* of his estate, was substituted as a party defendant. An amended complaint was filed, which charged that while plaintiff was in the care, custody and control of Dr. Porter and the Lake View Hospital Association and Training School for Nurses, for a cervix operation, a certain electrical wire instrument was used and that through the alleged negligent, careless, wanton and malicious use of said instrument by Dr. Porter and the other defendant, the electrical cord was caused to burn and break off and part of the wire remained in the abdomen of the plaintiff to the disturbance of her vital organs. The answers denied all the acts of negligence and damage.

The trial was before the court and a jury. The court directed a verdict in favor of the defendant, John J. Flavin, administrator *de bonis non* of the estate of Ezra C. Porter, deceased. The jury returned a verdict in favor of plaintiff and against the defendant, Lake View Hospital Association and Training School for Nurses, and assessed plaintiff's damages at the sum of $2,000. Motions for a directed verdict, for a new trial and for judgment notwithstanding the verdict, were overruled, and judgment was entered on the verdict, to review which this appeal is prosecuted. For convenience, the Lake View Hospital Association

and Training School for Nurses, a corporation, will be referred to as the defendant, or the hospital.

Plaintiff's theory of the case is that the hospital while under the duty, failed to exercise reasonable care and caution in furnishing a cautery apparatus in a reasonably fit and safe condition for use in the operation, whereby electric current escaped from said apparatus and burned plaintiff and caused wires from the cord of the apparatus to become imbedded in the body of plaintiff, and that the court properly entered judgment on the verdict against the hospital. The theory of defendant is that it was not guilty of any negligence whatever in supplying the electrical cautery apparatus to Dr. Porter for the operation on the plaintiff; that there is no evidence tending to show that there was any defect in this electrical apparatus; that there is no evidence whatsoever to support plaintiff's theory that some part of the insulated cord was broken or was burned off by the electric current, or that any piece of wire became embedded in the person of the plaintiff during the operation; that the court erred in refusing to instruct the jury to find the defendant not guilty at the close of all the evidence, in overruling its motions for judgment notwithstanding the verdict and for a new trial; in admitting improper evidence, in giving improper instructions and in refusing proper instructions. Defendant also contends that the verdict is against the manifest weight of the evidence and that it is for an excessive amount.

Plaintiff went to the hospital on Saturday, May 11, 1935, for an operation on her uterus to be performed by Dr. Ezra C. Porter. She was then 34 years of age and resided with a minor daughter. She had been a registered nurse for 11 years, and at the time she entered the hospital was regularly employed as a registered nurse. For about six months previous to her admission to the hospital, she had been having slight hemorrhages from the uterus. On the morning

of Monday, May 13, 1935, the operation was performed by Dr. Porter. Plaintiff was placed on her back on an operating table, her limbs held in an apparatus described as "stirrups." Dr. Porter sat on the seat of a high stool between the patient's knees. An interne, Dr. Maurice Goldstein, was immediately to her left. Frances Borchert, a registered nurse employed by the hospital as surgical supervisor, and who had charge of all activities in the operating rooms, the central dress rooms and the emergency rooms, stood immediately to the right of the patient. Dr. Goldstein was admitted to practice in 1933 and was resident interne at the hospital from June of that year. He assisted at surgical operations. The patient was subjected to anesthesia. Dr. Porter performed the operation on the mouth of the uterus of plaintiff. This operation took approximately thirty minutes. Then a "regular cautery machine" into which electricity was introduced, was used by Dr. Porter. This machine is also spoken of as a "radio knife." The nurse, Frances Borchert, supervised the cautery machine. It was kept in a supply room next to one of the operating rooms. Whenever it was to be used it was inspected by her in order to determine whether it was in condition to be used. The cautery machine used consisted of a cord and plug which is plugged into an outlet and leads to a box. The interior of the box consists of one or two vacuum tubes which changes the current in the hospital to a high frequency alternating current. A cord to which a cauterizing tool is attached, leads from the box. This cord terminates in a small pencil-like holder for the particular tool that is to be used at the time. The tool to be inserted may be a cutting blade or a cauterizing tool. The part of the instrument that is applied to the flesh in cauterizing is called the tip. When the instrument is used for cauterizing it is frequently called a "cauterizing pencil." Inside the handle are mainly connections

between the cord and the tip and suitable insulation so that the tip can be handled and conveniently used. The holder is designed to allow the wire which comes into the handle to carry electric current through to the tip which is used for cauterizing. The patient had a piece of linen over her, known as a lithotomy sheet, designed to cover all areas except a sufficient area exposed for the doctor to work. The cabinet of the machine was on the patient's right, the same side on which the nurse was standing. The doctor held the cauterizing pencil in his right hand. There was sufficient slack in the cord so that it could be handled with ease. The power was controlled by the doctor by a foot switch. When he wanted electric current to come through he put down his foot, and when he wanted the current discontinued he lifted his foot. The nurse did not operate the instrument. She did, however, control a separate switch to cut in the current or to shut it off. Dr. Goldstein, called by plaintiff, testified that he saw Dr. Porter using the instrument during the cauterizing process; that he heard a sparkling or sizzling noise and the operation was stopped; that this sputtering or sparkling sounded a little louder than normal; that after he heard this sizzling or crackling noise, some ointment was applied by him to a burn on the surface of the pubic bone directly above the opening of the vagina; that he saw the wound the following morning and it looked a little redder and that the surface skin had started to come off; that when he first saw the area over the pubic bone the skin was not broken; that when he examined the area the next day he did not see any wires in it and that he did not see any wires in it the first time he applied ointment; that the apparatus belonged to the hospital; that he had been present when that same cautery apparatus had been used in other operations; that the cord of the apparatus, running from the box to the cautery pencil, was not lying across the patient's abdomen at the

point where he saw the burn; that he would not say definitely that the extension cord came across or over her body; that he did not see any wires break off or burn. Ralph Manley, an associate professor of chemistry at Armour Institute, called by plaintiff, testified that he made an analysis of some particles of copper wire which were exhibited to him; that such analysis showed them to be predominantly copper. Plaintiff testified that after she came out of the anesthetic she noticed a pain over her pelvic bone, about one inch to the left of the vaginal orifice; that ointment had been placed on the skin with a gauze covering; that she remained in the hospital until Thursday, May 16, 1935; that Dr. Porter continued to treat her at home; that he came almost every day to take care of her uterus condition and also the burn; that she noticed the tissue around the burn began to slough and in three or four weeks she had quite a large abscess; that the abscess protruded about one inch from the wound and that it was perhaps an inch and a half wide; that it was opened and drained; that before it was opened and drained she felt a pricking sensation, as if being "stuck with some little thing"; that Dr. Porter cleaned it out; that he found "something" in the abscess, which he showed to her; that there were three particles of metal which he showed to her; that after Dr. Porter had taken out the pieces of metal the abscess healed over; that it then opened up again; that he continued to treat her until about August 1, 1935, when she went to Dr. Channing W. Barrett for treatment, at whose direction she went to the Henrotin Hospital on August 13, 1935, where an X-ray was taken; that Dr. Barrett operated on the abscess and removed a piece of metal, which he gave to her; that Dr. Barrett drained the abscess; that it opened up at the end of ten days and then healed up; that she went on a boat trip to South America for about a month and then returned to the position which she had left at the time she entered the

hospital; that she spent many sleepless nights in 1935 until the burn was completely healed. She further testified that her normal weight prior to May 13, 1935, was 116 pounds, and that by October, 1935, her weight had declined to 89 pounds. Dr. Barrett testified for plaintiff that he examined her about August 1, 1935; that she had a condition in the vagina, the cervix was swollen and raw, with a little growth there; that he saw her later on in August, and that she had a sore place on the vulva; that it was about the size of a dollar and indurated; that it had an opening down into it from which discharges came; that he directed her to go to the Henrotin Hospital, where an X-ray was taken; that he operated; that the operation consisted of cleaning out the wound and taking out the little piece of wire which was disclosed by the X-ray; that it was probably two months following the operation which he performed before the sore healed over so it would not break open again; that it healed over and left a tender scar; that he treated her for about a year and a half; that the treatment was partly for the wound and partly for a bad condition of the cervix; that she came to him for treatment of the cervix for quite a while; that he recommended that she go to a hospital or that she take a trip for a rest; that the pus conditions and changes in the cervix and uterus and the swelling would cause a woman to become nervous and would bring about a run down condition, lower resistance and loss of weight and appetite. In answer to a hypothetical question, Dr. Barrett gave his opinion that something had happened to the electrical apparatus and that these wires were driven through a very small opening. He further testified that at the time he saw the wires, there did not have to be a breaking of the skin for their insertion. Paul G. Andres testified for the plaintiff that he was a teacher of electrical engineering at Lewis Institute, Chicago. In answer to a hypothetical question, over the objection of the defendant, he gave

a lengthy opinion to the effect that the electrical cord part of the cautery apparatus is composed of many fine wires; that when that conductor is abraded or a portion of that wire becomes exposed, then that wire acts as a secondary electrode and starts to cut or cauterize; that "in the handling of that wire these wires after a period of time become broken, have sharp edges on them, and may project beyond the cord," and, assuming the escape of a piece of wire from the insulated cord, that he thought the tip would be heated and burned off by the current into the flesh of the patient. He also gave his opinion that the cord could not have been away from the point of plaintiff's skin where the pieces of wire were found. The pieces of copper wire were identified and received in evidence. The nurse, Frances Borchert, testified on behalf of defendant that she inspected the apparatus and cord prior to its use on the plaintiff and there was no fraying of the insulation and no wires were protruding from the insulation; that the cord from the box passed over the patient's right thigh; that the patient had a lithotomy sheet over her, which was designed to cover all areas except a sufficient area exposed for the doctor to work; that this area was in the mid line and over the pubic bone; that the cord did not at any time pass over that area; that the handle of the radio knife did pass over that area; that at the time the radio knife was laid on the pubis there was a buzzing sound and all work was discontinued to investigate the sound; that she looked at that portion of plaintiff's body and saw a red spot on the symphysis pubis, about the mid line and slightly to the left; that the cord at this time was over the plaintiff's right thigh and 12 to 14 inches from the place she saw the red spot; that the spot was less than the size of a dime and Doctors Porter and Goldstein examined it; that she saw no breaking of the skin and no bleeding; that after the operation she assumed charge of the cautery machine, examined the

cord and put it away; that it appeared in good condition the same as before the operation; that the machine was used afterwards and the same cord was used and that it was in good condition; that there was sufficient slack in the cord so that it could be handled with ease; that it laid on plaintiff's thigh in front of her and that she was sure no part of the cord ever touched the front part of plaintiff's body; that the cord was inserted permanently into the handle; that the handle was of solid material and that she did not see any place about the handle where any wire could have come out.

The first point urged is that the trial court erred in overruling the motion of the defendant for judgment in its favor notwithstanding the verdict. The second point is that the trial court erred in refusing to instruct the jury to find the defendant not guilty at the close of all the evidence. Defendant maintains that there is no evidence in the record tending to show or from which it could be inferred that the defendant was guilty of the negligence charged against it, or of any negligence whatever in and about its electrical cautery equipment furnished by it for plaintiff's operation by her own doctor, and that a verdict cannot be sustained where essential facts are left in the realm of conjecture and speculation. Plaintiff came to the hospital and was brought to the operating room. An anesthetic was administered. She, of course, did not know what happened. She was in the hands of her own physician and the nurse and an interne in the employ of the hospital. There can be no doubt that the burn which she suffered was caused by the cauterizing machine. Dr. Goldstein and the nurse both testified that when the sparkling, sizzling, crackling noise, which sounded louder than normal, came from the cauterizing machine, the operation was stopped. This indicates that both of them recognized that there was something wrong with the machine. The cauterizing

machine was not again used in the operation. It is apparent that but for the unusual noise Dr. Porter would have continued with the use of the machine. The record clearly establishes that the abscess developed in the place where the burn was inflicted by the cautery pencil. Dr. Porter removed three pieces of wire from the wound so caused. The wound then healed over. However, it opened up again. She then consulted Dr. Barrett and at his suggestion she entered the Henrotin Hospital, where an X-ray revealed a small piece of wire. He operated and removed this piece of wire. Thereafter, the wound healed. The pieces of wire are similar to the wire in the cautery apparatus. We find that the jury had a right to draw the inference that the cauterizing machine inflicted the burn and that this machine also caused the pieces of wire to enter her body. We are satisfied that the jury had ample evidence on which to base a finding that the defendant was guilty as charged in the amended complaint.

The next point advanced by the defendant is that the court erred in admitting improper evidence and in refusing to strike out such improper evidence. Defendant complains of a hypothetical question propounded to Dr. Barrett which he was allowed to answer, and also insists that it was error to allow Paul G. Andres to answer a hypothetical question. The questions are based upon the testimony and are not misleading. The testimony of these witnesses related to matters of peculiar knowledge and skill not common to the average man. Owing to the nature of this case we find that the court did not err in allowing the hypothetical questions to be answered.

The defendant also argues that the court erred in giving to the jury instructions Nos. 6 and 16, requested by plaintiff. The criticism voiced against these instructions is that the evidence does not support them. We do not agree with that contention. Defendant in-

sists that the court erred in refusing to give instructions Nos. 24, 25 and 26, requested by it. We agree with plaintiff that instructions Nos. 24 and 25 are peremptory in their nature and misleading, and that the court was right in declining to give them. Instruction No. 26 is a proper instruction. It tells the jury that the defendant was not responsible for the ailment or malady from which she was suffering at the time she came to the hospital for treatment. We find that instruction No. 7, given in behalf of defendant, told the jury that "with respect to the ailments and disabilities claimed by the plaintiff in this case the burden is upon the plaintiff in that respect as it is with respect to the question of liability to show by a preponderance of the evidence not only that such ailments really existed but also that such ailments and disabilities are the result of the acts in question." As the latter instruction covered the subject, the court did not err in refusing to give instruction No. 26.

The fifth point advanced by defendant is that the court erred in overruling its motion for a new trial for the reason that the verdict is against the manifest weight of the evidence. We are of the opinion that the verdict is not against the manifest weight of the evidence, and that the jury was fully justified in the verdict that it returned. Finally, defendant maintains that the verdict is excessive. We cannot agree with this contention. The sum of $2,000 awarded by the jury is not excessive. The record establishes that the jury was fully warranted in fixing the damages at $2,000.

Because of the views expressed, the judgment of the superior court of Cook county is affirmed.

*Judgment affirmed.*

HEBEL, P. J., and DENIS E. SULLIVAN, J., concur.