JOHN PAULSEN, Plaintiff-Appellant, v. THE DEPARTMENT OF PRO-FESSIONAL REGULATION *et al.*, Defendants-Appellees.

Third District   No. 3—99—0372

Opinion filed November 1, 2000.

Craig L. Unrath (argued), Karen L. Kendall, and Roger R. Clayton, all of Heyl, Royster, Voelker & Allen, of Peoria, for appellant.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Edmund C. Baird (argued), Assistant Attorney General, of counsel), for appellees.

JUSTICE SLATER delivered the opinion of the court:

The Illinois Department of Professional Regulation (the Department) placed John Paulsen's license to practice medicine on probationary status for two years on the ground that he had committed gross negligence in the practice of medicine (225 ILCS 60/22(A)(4) (West 1992)). The circuit court affirmed this decision in an administrative review proceeding. On appeal, Paulsen contends that the Department's decision is arbitrary and capricious and against the manifest weight of the evidence. For the reasons that follow, we affirm.

In 1989, Paulsen treated John Clauser for two abdominal hernias. An abdominal hernia is a protrusion of internal tissue through a defect in the abdominal wall. While treating the hernias, it was discovered that Clauser suffered from a gall stone, cirrhosis of the liver, portal hypertension, and hypersplenism. Portal hypertension is an increase in blood pressure in the portal vein, the primary blood vessel bringing blood to the liver for removal of toxins. The condition is often symptomatic of a cirrhotic liver and may cause increased blood pressure in, and dilation of, other collateral blood vessels. Hypersplenism is a malady of the spleen whereby, among other things, elements of the blood necessary to coagulation, such as platelets, are consumed by the spleen resulting in coagulation disorders collectively known as "coagulopathy."

In addition to repairing the hernias, Paulsen removed Clauser's spleen and gall bladder. Paulsen accomplished these tasks by means of a laparotomy, *i.e.*, a direct incision into the affected area of the abdomen. In his notes, Paulsen observed that the operation had gone well despite Clauser's cirrhosis and "severe" portal hypertension.

In August 1991, another physician treated Clauser for pancreatitis (inflammation of the pancreas) and peritonitis (inflammation of the peritoneum). The peritoneum is a membrane located between the inner abdominal wall and the outer surfaces of the abdominal organs.

At discharge, the treating physician stated that Clauser's prognosis was "somewhat dismal" because he had "hepatic [liver] insufficiency, marked esophageal varices, and will most probably develop further complications in the future." A varix is a dilated blood vessel. An esophageal varix is a dilated blood vessel of the esophagus.

On June 21, 1993, Clauser was admitted to the hospital after experiencing acute abdominal pain. Paulsen determined that Clauser was suffering from a one- to two-centimeter abdominal, ventral hernia. A portion of Clauser's peritoneum was protruding through his abdominal wall. After discussing the matter with Paulsen, Clauser elected to undergo a laparoscopic repair of the hernia. In a laparoscopy, the surgeon inserts tubes, or "trocars," into the abdomen through which he introduces an endoscope to observe the interior of the abdomen and surgical tools to repair defects in the abdominal wall.

On July 6, 1993, despite the fact that he had not reviewed the records of Clauser's 1991 treatment, Paulsen began to repair Clauser's hernia laparoscopically. Upon inserting four 10- to 12-millimeter trocars into Clauser's abdomen, Paulsen observed several adhesions of the peritoneum to the abdominal wall. In order to conduct a search for other hernias, it was necessary to remove the adhesions by separating the adhering sections of the peritoneum from the abdominal wall. After accomplishing this task, Paulsen discovered what might have been another small ventral hernia near the targeted hernia. It is unclear from the record whether Paulsen ever definitively identified this apparent defect as a secondary hernia or undertook any efforts to repair it.

During the operation, Clauser began experiencing more bleeding than Paulsen had anticipated. Paulsen converted the laparoscopy into a conventional laparotomy to gain sufficient access to Clauser's abdomen so that he could properly ligate any hemorrhaging blood vessels. Paulsen ligated several blood vessels, placed a surgical patch over the area of the repaired hernia, and concluded the operation. Clauser lost 2,000 cubic centimeters of blood during the operation. Clauser's normal blood volume was 6,000 cubic centimeters.

During the morning of July 7, after Clauser had received several blood transfusions, it became evident that he was still bleeding internally. Paulsen undertook another surgery to stop the internal hemorrhaging. After Paulsen ligated several more blood vessels, the bleeding appeared to cease.

Subsequently, however, Clauser developed a condition known as disseminated intravascular coagulation (DIC). DIC is a blood coagulation disorder characterized by a reduction in the elements necessary to blood clotting due to their use within blood vessels. In the late stages of DIC, hemorrhaging is profuse and widespread. The development of DIC is a risk for patients with hepatic cirrhosis. Latent DIC is sometimes activated by the trauma associated with surgery.

Clauser's condition stabilized. However, by that time, Clauser had developed adult respiratory distress syndrome. On July 20, Clauser died of pulmonary failure.

In March 1996, the Department filed its complaint alleging that Paulsen had committed gross negligence in the practice of medicine (225 ILCS 60/22(A)(4) (West 1992)). In particular, the Department alleged that the following acts or omissions, among others, were evidence of Paulsen's recklessness or carelessness: (1) failing to do preoperative blood clotting studies; (2) failing to obtain a complete preoperative evaluation; and (3) performing a laparoscopic repair rather than a conventional laparotomy.

The matter proceeded to a hearing. At the hearing, Paulsen testified that he had completed 150 hours of continuing medical education (CME) concerning laparoscopic techniques by the time of Clauser's surgery. He had employed laparoscopy to perform approximately 250 cholecystectomies (gall bladder removals), 30 to 40 repairs of inguinal hernias (hernias in the groin region), 3 repairs of ventral hernias, and an appendectomy. Paulsen recalled that he had performed his first laparoscopic ventral hernia repair in March 1993. Paulsen agreed that ventral hernias are more difficult to repair than other types of hernias due to the frequency of adhesions.

Paulsen recalled that Clauser was a heavy laborer, approximately 5 feet 10 inches tall and 195 pounds with a "somewhat rotund" physique. Paulsen believed that laparoscopy was the preferred method to repair Clauser's ventral hernia for several reasons. First, given Clauser's physical characteristics, the likelihood that the hernia would recur if repaired by a laparotomy was 50%. Second, laparoscopy allows the surgeon to see more of the abdomen and more easily identify secondary hernias than does laparotomy. Third, laparoscopy requires less recovery time and allows patients to return to work earlier.

Paulsen recalled that Clauser told him he had been treated for

pancreatitis in 1991 but did not mention that he had also suffered from peritonitis in 1991. Paulsen did not review the records from Clauser's 1991 treatment prior to undertaking the 1993 surgery. However, Paulsen testified that, even if he had reviewed the records, the information in those records would not have changed his decision to proceed with a laparoscopic repair of Clauser's hernia.

Preoperative testing showed Clauser's platelet level to be 133,000. Paulsen testified that a platelet level less than 50,000 is a contraindication for surgery. An hour into the July 6 surgery, Paulsen converted the operation into a laparotomy due to persistent bleeding from open blood vessels. However, at no time did Paulsen find evidence of coagulopathy. Likewise, Paulsen observed no signs of coagulopathy during the July 7 operation. According to Paulsen, Clauser probably began experiencing DIC by the evening of July 7 when his platelet level dropped to 52,000.

The Department called physician Max D. Hammer, a general and vascular surgeon, to testify. Hammer testified that he has performed several laparoscopic procedures, including splenectomies and cholecystectomies. He estimated that he has performed less than five ventral hernia repairs laparoscopically. In addition, Hammer testified that he has never performed a laparoscopic operation on a patient with cirrhosis or portal hypertension.

In Hammer's opinion, Paulsen's decision to repair Clauser's ventral hernia laparoscopically was careless. Hammer observed that, although a ventral hernia should normally be repaired, the risk presented by laparoscopic repair was "exorbitant" in view of Clauser's cirrhosis, portal hypertension, and the reduction in intraperitoneal space resulting from Clauser's prior surgeries. Hammer also testified that Paulsen should have ordered blood clotting assays prior to performing the surgery. Hammer further testified that he probably would not have reviewed the records related to Clauser's 1991 pancreatitis and peritonitis.

On cross-examination, Hammer testified that converting a laparoscopy to a laparotomy in order to control hemorrhaging is within the standard of care. Moreover, Hammer agreed that laparoscopy has a number of advantages over the laparotomy. Specifically, Hammer admitted that it is easier to identify secondary hernias with laparoscopy, that a patient generally experiences less postoperative discomfort, and the patient can usually return to work faster. In addition, although he estimated the recurrence rate for ventral hernias is 10%, he agreed that the rate increases in obese patients and that Clauser was obese or close to obese. Hammer also testified that DIC can be triggered by a laparotomy, as well as a laparoscopy.

The Department called physician Andrew Gorchynsky to testify. Gorchynsky testified that he is familiar with and has performed a number of laparoscopic operations. Although he has repaired ventral hernias, he has never repaired a ventral hernia laparoscopically.

Gorchynsky opined that Paulsen had committed "gross negligence" by performing a laparoscopy on Clauser. In particular, Paulsen "inadequately assessed [Clauser] preoperatively" and Clauser's condition contraindicated laparoscopy as a method to repair the ventral hernia. With respect to Clauser's preoperative condition, Gorchynsky opined that a laparoscopy should not have been performed in view of Clauser's portal hypertension, the extensive prior surgery in the peritoneal area, and the history of inflammation (the 1991 pancreatitis and peritonitis).

Gorchynsky testified that a laparotomy would not have required Paulsen to dissect the peritoneum away from the abdominal wall. As a result, Paulsen would not have violated the blood vessels in the peritoneum and adjacent structures if he had performed a laparotomy, rather than a laparoscopy.

Dr. Thom E. Lobe testified on behalf of Paulsen. Lobe testified that he teaches laparoscopic techniques and is familiar with the national standard of care for laparoscopic surgery. Lobe opined that Paulsen's decision to perform a laparoscopy was not a deviation from the standard of care. In particular, Lobe asserted that cirrhosis, portal hypertension, varices, and adhesions were not contraindications to laparoscopic surgery in 1993.

Lobe testified he would have ordered preoperative blood clotting assays, but Paulsen's failure to do so had no effect on Clauser's "outcome." Lobe found no evidence of coagulopathy in the records of the July 6 or July 7 operations. Lobe explained that the internal bleeding that occurred during the July 6 operation was "mechanical" bleeding, or bleeding from severed or punctured blood vessels, rather than coagulopathy. Moreover, Clauser's preoperative blood screen showed that his platelet count was normal. Clauser only developed DIC after the July 7 surgery, either that evening or the next day.

Lobe testified he would not have reviewed the records of Clauser's 1991 treatment for pancreatitis and peritonitis prior to performing a laparoscopy. According to Lobe, such a review was unnecessary because the 1991 surgery related to the pancreas, an organ not directly involved in the 1993 hernia repair.

Dr. Leonard Schultz also testified on Paulsen's behalf. Schultz testified that he is familiar with the national standard of care for laparoscopic surgery, having trained approximately 3,000 surgeons in laparoscopic procedures, including the repair of ventral hernias.

Schultz opined that Paulsen did not deviate from the standard of care by performing a laparoscopy. Schultz testified that Clauser's internal hemorrhaging was a complication arising from the necessity of dissecting the peritoneum away from the abdominal wall, a procedure which is a necessary part of a laparotomy, as well as a laparoscopy. Schultz concluded that Clauser did not suffer any complication specific to laparoscopy.

Schultz further testified that Clauser's condition did not contraindicate laparoscopic repair of his ventral hernia. In addition, Schultz testified that Paulsen did not deviate from the standard of care when he elected not to order preoperative blood clotting assays. According to Schultz, the assays were unnecessary in view of Clauser's platelet count and the absence of any visible manifestation of portal hypertension.

The Department's hearing officer concluded that Paulsen had committed gross negligence in his practice of medicine by failing to review the records of Clauser's 1991 treatment for pancreatitis and peritonitis and by choosing to perform a laparoscopy, rather than a laparotomy, when a laparotomy would have avoided "the problem area." The hearing officer recommended that Paulsen's license to practice medicine be placed on probation for one year and that Paulsen complete 25 hours of CME. The Illinois State Medical Disciplinary Board (the Board) adopted the hearing officer's findings of fact and conclusions of law, but recommended that the Director of the Department (the Director) place Paulsen's license on probation for two years and require him to complete 50 hours of CME. The Director followed the Board's recommendation.

Pursuant to the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 1998)), Paulsen filed a complaint in the circuit court seeking judicial review of the Department's decision. The circuit court affirmed the Department's decision, ruling that the decision was not contrary to the manifest weight of the evidence.

On appeal, Paulsen contends that the Department's decision is arbitrary and capricious and against the manifest weight of the evidence.

■ Judicial review of an administrative decision extends to all questions of law and fact presented by the administrative record. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 606 N.E.2d 1111 (1992). On administrative review, it is not the court's function to reweigh the evidence or make an independent determination of the facts. *Abrahamson*, 153 Ill. 2d 76, 606 N.E.2d 1111. Rather, the court is to ascertain whether the findings and decision of the agency are against the manifest weight of the evidence. *Abraham-*

*son,* 153 Ill. 2d 76, 606 N.E.2d 1111. A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Abrahamson,* 153 Ill. 2d 76, 606 N.E.2d 1111.

■ Under the Medical Practice Act of 1987 (the Act) (225 ILCS 60/1 *et seq.* (West 1992)), the Department may take disciplinary action against a physician if the physician has committed "[g]ross negligence in practice under [the] Act" (225 ILCS 60/22(A)(4) (West 1992)). The Act directs that the Department, upon recommendation of the Board, adopt rules defining what constitutes gross negligence in the practice of medicine. 225 ILCS 60/22(A) (West 1992). The rules adopted by the Department define gross negligence as "an act or omission which is evidence of recklessness or carelessness toward[,] or disregard for[,] the safety or well-being of the patient, and which results in injury to the patient." 68 Ill. Adm. Code § 1285.240(c) (eff. June 21, 1989). The Department has the burden of proving violations of the Act by clear and convincing evidence. 68 Ill. Adm. Code § 1110.190(a) (eff. January 1, 1988).

■ In the instant case, the Department's expert witnesses testified that laparoscopy requires surgical intrusions that are unnecessary when a laparotomy is performed. The Department's experts opined that, given these surgical intrusions, laparoscopy substantially increases the risk of internal hemorrhage to patients suffering from cirrhosis and portal hypertension. In addition, the evidence demonstrated that the trauma associated with surgery can activate a latent blood coagulation disorder.

In light of this evidence, the Board could have rationally inferred that Paulsen acted carelessly by performing a laparoscopy on a patient suffering from cirrhosis and portal hypertension. Moreover, it was reasonable for the Board to infer that this carelessness caused John Clauser to suffer injury, namely, postoperative bleeding, trauma, and coagulopathy he would not have suffered but for the decision to perform a laparoscopy, rather than a laparotomy.

Contrary to Paulsen's assertion, the Board did not merely conclude that a laparotomy was the preferable alternative between two acceptable medical procedures. See *Advincula v. United Blood Services,* 176 Ill. 2d 1, 24, 678 N.E.2d 1009, 1021 (1996) ("[a] difference of opinion between acceptable but alternative courses of conduct is not inconsistent with the exercise of due care"). The Board determined that a laparoscopy was not an acceptable procedure in view of Clauser's condition, especially his cirrhosis and portal hypertension. Whether a particular medical procedure is within the standard of care cannot be determined in a vacuum. Rather, such a determination can only be made with reference to the individual patient's condition at the time the procedure is performed.

Paulsen also complains that his decision not to order preoperative blood clotting assays "had no effect on the outcome of the surgical procedure and was within the standard of care." Although the hearing officer found that Paulsen had "failed" to order the assays in question, the hearing officer did not cite this failure as a basis for his finding of gross negligence. Accordingly, we need not address the propriety of a finding that had no discernible effect on the Board's decision.

We likewise find unpersuasive Paulsen's argument that the Department failed to present evidence linking laparoscopic procedures with the cause of Clauser's death. A causal link between laparoscopy and the cause of death was not part of the Department's burden of proof. The Department's burden was to show that the decision to perform a laparoscopy was reckless or careless and caused some injury to Clauser. See 68 Ill. Adm. Code § 1285.240(c) (eff. June 21, 1989). The Department satisfied the causation element of its burden by producing evidence demonstrating that the choice of performing a laparoscopy caused Clauser to suffer internal bleeding and trauma he would not have suffered had a laparotomy been performed.

Equally unavailing is Paulsen's argument that the Department's decision should be reversed because portal hypertension is not a contraindication for laparoscopic surgery. The Department elicited expert testimony that portal hypertension is a contraindication to laparoscopic surgery. Paulsen elicited expert testimony to the contrary. The Board was not required to resolve this conflicting testimony in Paulsen's favor. Moreover, the resolution of conflicts in evidence is within the province of the trier of fact; a province not to be invaded by a court of review. *Hajian v. Holy Family Hospital*, 273 Ill. App. 3d 932, 652 N.E.2d 1132 (1995).

■ Finally, we reject Paulsen's contention that the Department's evidence was insufficient because its expert witnesses were unfamiliar with, and failed to apply, a national standard of care in assessing Paulsen's conduct. Paulsen fails to cite any authority for the proposition that a national standard of care applies to a finding of "gross negligence" under the Act (225 ILCS 60/22(A)(4) (West 1992)). Furthermore, even assuming that a national standard is applicable, Paulsen fails to explain what the standard is or how it differs from the standard applied by the Department's expert witnesses. Accordingly, we hold that the Board's decision is neither arbitrary and capricious, nor contrary to the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of Peoria County is affirmed.

Affirmed.

BRESLIN and LYTTON, JJ., concur.